We are hearing an echo again, but I will proceed and for the record recite the cases we are hearing. Fairholme Funds v. United States 20-1912, Owl Creek Asia v. United States 20-1934, Arrowwood Indemnity v. United States 20-2020, and Cacciapalle v. United States 20-2037. Mr. Bennett, please proceed. Thank you, Your Honor. For the record, it's Bruce Bennett of Jones Day on behalf of the Owl Creek Plaintiffs. May it please the Court. The Court of Claims' decision that it had jurisdiction over this case should be affirmed. The main reason is found in two parts of the Supreme Court's recent decision in Collins. It's not about whether the FHFA or the agency, I will use those terms interchangeably, is the government. It clearly is. In Collins, the majority opinion holds that it is the government and supplemental reply essentially concedes the same. The question is, does FHFA shed its governmental character when it becomes a conservator for a GSE? That issue was actually squarely decided in Collins as a matter of construction of the Recovery Act. It was addressed in two distinct parts of the opinion. First, in the beginning of the case, in the beginning of the opinion, in the APA part of the opinion, the Supreme Court held that it did not have to decide whether the net worth sweep was in the best interest of the companies because the FHFA as conservator was authorized to take actions that were in the best interest of the agency, whether or not the actions were in the best interest of the companies. This part of the Supreme Court's opinion isn't mentioned in the government supplemental papers because Collins rejects the argument that the agency's adoption of the Third Amendment can be characterized as a purely commercial activity. The court said, when the FHFA acts as conservator, it may aim to regulate the regulated entity in a way that while not in the best interest of the regulated entity, is beneficial to the agency and by extension to the public it serves. Counsel, this is Judge O'Malley. Even if we agree with you that Collins discussed the fact that the FHFA as conservator would, for certain purposes, be acting as the government, that doesn't foreclose the conclusion that for other purposes it might not be, correct? Well, except that when it was decided in the APA case, Your Honor, the court actually decided that the government was, excuse me, that the FHFA was exercising governmental or executive power in connection with the Third Amendment decision. That is why... I'm saying that the concern that the government has raised that, you know, when the conservator is really just acting as a market participant, that that might impact the ability to act on behalf of the entities. And as I understand your argument, you don't go that far, correct? Oh, I'm sorry, I didn't understand your question. You're correct, Your Honor. We do not go that far. The FHFA, when it's enforcing mortgages, for example, it's not going to be considered to be exercising governmental power unless it's doing something beyond the scope of those I think the quintessential case for commercial action is when the FHFA as conservator inherits a pre-conservatorship contract relationship and is abiding by it. So just that the court says it twice, because it also goes on to say the Recovery Act therefore authorized the agency to choose this option. The option it's referring to is, again, it's a Third Amendment transaction. The option was an option which was not necessarily in the best interest of the entities or their shareholders, but was in the best interest of the public in the view of the FHFA. And that's why there was no review under the APA. So counsel, let me move on to another question though. So there's a lot of things that seem to be addressed in Collins. So assuming we agree with you that the conservator is acting as a government for purposes of the Court of Federal Claims jurisdiction as it relates to the Third Amendment, as I understand your takings claims and your illegal exaction claims, they're sort of two sides to a coin, right? If an activity is unauthorized, then it's an illegal exaction. But if it's an authorized government action, then you're simply asserting it as a takings. Is that right? That is exactly correct. But doesn't Collins say that the Third Amendment was authorized both statutorily and to the extent there's any reference to an apportionment clause issue, that it was also legal because it was entered into by the acting director? Yes, Your Honor. We believe this is a takings case under Collins as opposed to an illegal exaction case. They're both sides of the same coin in our view. Okay. I just want to make sure. We're trying to figure out where we are with all this. Okay. So can I... If I could see... This is Judge Prost. Can I just take straight to the takings case since that's what we're talking about? So let me understand the takings that you've alleged. Can you hear me? Yes. I can hear you. And this is a subject for... This is a subject that Mr. Hume is going to cover, the person immediately following me. And if the court wants to move on to that, I can save my time and let him proceed. Well, I'd ask Judge Lurie to make that decision. I just have to get on with the takings. I don't know if others... What other issues are you in charge of? I'm about jurisdiction. Well, I think if counsel is arguing jointly, we ought to be all prepared to address each issue. But if Judge Prost is prepared to hold her question for Mr. Hume, Mr. Bennett should proceed with what he's prepared to argue on. Sure. Happy to do that. Thank you. Can I ask you then a basic question about jurisdiction as it relates to the contract claims? Contract claims. Now, as I understand, those are being asserted only as direct claims by everyone other than Fairholme. Correct? Fairholme. That's my understanding as well. Okay. And putting aside preclusion issues for a minute, am I correct that the Court of Federal Claims sort of just... At least to the extent it dismissed, it should have been dismissing for failure to state a claim as it relates to the direct claims and the claim that they're third-party beneficiaries because of course the Court of Federal Claims has jurisdiction over contract claims against the government. That is our position as well, Your Honor. Okay. All right. Then what about preclusion? I mean, didn't as it... At least as it relates to Fairholme and there are other, I think, of the appellants that are implicated, but why isn't there preclusive effect at least as it relates to the non-constitutional claims from the Perry decision? Your Honor, all of Jones Day clients were not in the Perry case, so there is no preclusion as to us. Well, but when you're talking about it, it was a derivative action that was at least brought. It wasn't the... It wasn't only a direct action, right? Well, I don't think that the Court ever considered the merits of the derivative action, which would have been required for collateral estoppel effect. And we weren't parties, so there could not be a res judicata effect. Well, it's not... I'm talking about issue preclusion, and it's different. You don't... It's not the same as a class action. It's... When it's derivative, it has been brought on behalf of the corporation. And so it would still be the corporation who is the party, correct? The corporation would be the party, but I don't think that there was any decisions on the merits that affected the claims that were asserted here. Okay, but they did consider HERA, correct, and say that all claims must be derivative, and all derivative claims are swept into the succession clause. Some claims were... Some specific claims were dealt with under the succession clause, but I don't believe that the derivative claims that were asserted here were involved in that case. And they... And there are differences, as the Supreme Court recognized also, as to which claims would be subject to the succession clause and which claims wouldn't be. Okay, so what do you think the Supreme Court said about which claims are subject to the succession clause and which are not? Well, it only considered one specific claim. It considered whether or not the succession clause was applicable to the claim asserted in the Fifth Circuit relating to the APA claim. That was the only one before it in that context. So I don't understand what you're saying, that the Supreme Court actually differentiated between that and other claims. It just didn't address other claims, right? No. It didn't address... That's probably a better way to say it. It did not address other claims, and it said that there were... You know, it didn't sweep all... It did make pretty clear that it would not take all of them, because it didn't take the one involved in front of the Supreme Court either. I'm sorry. I'm not clear on that point. Could you point us to what you're talking about in Columns, if I'm judge-correct? Yeah. There's a section of Columns that deals with the succession clause, and it's a long opinion. I'm not going to be able to find it within my time. But that section described it specifically holds that the particular claim that the government asserted was subject to the succession clause was not. I'm sorry. It related to the Appointments Clause issue. So the Supreme Court, I think, by what they did, there wasn't a specific discussion of any... There wasn't a... That's my time. But there wasn't a specific discussion of any other claim, but it clearly admitted the possibility that some claims were not subject to the succession clause, because that one wasn't. Judge Prost, does your question then answer? Yes. Yes. Thank you. All right. Mr. Bennett, we'll save at least five minutes for you, and hear from Mr. Hume. Thank you, Your Honor. And may it please the Court, this is Hamish Hume from Boies Schiller Flexner for the Cacciapolli plaintiffs, who are the class representatives for the class of shareholders. Your Honors, I'm going to address the question of whether the takings claim is a direct claim or a derivative claim. We submit that the Court of Federal Claims erred in holding that the takings claims of the shareholders were derivative, and that this Court should reverse. Okay. Mr. Hume, before you get... Can I just ask you a threshold question about that? If we just agree with you, and we find that the shareholders' claims were derivative, where does that leave the takings question? It leaves the takings question as a derivative claim, which the Court said could proceed, was not barred by the succession clause. That is the issue raised by the government's cross-appeal, which Mr. Barnes is... That's the first part. I guess. So let me ask you the second part. What if we disagree with what the Court of Federal Claims said in First Hartford? What if we find that the succession clause does apply? And they're derivative claims. Does that ally completely any takings arguments we have? So if I understand the question correctly, if the court, this court, holds that the takings claims by the shareholders are all derivative and not direct, and also holds that the derivative claims are barred by the succession clause, and that this court's First Hartford decision does not apply for some reason, then the shareholders would be left with no claim, neither a direct claim nor a derivative claim. I would submit to your honors, and this wasn't raised in the briefing because it hasn't been right yet, that in that circumstance, the court ought to allow us to address the question, to brief the question, of whether the exceptions to the third-party standing rule should apply. And those exceptions are addressed. Wasn't that issue, wasn't it briefed? It was definitely briefed below. You raised the Kowalski question, and it's at least mentioned in a couple pages in the Fairholme brief, which is the only one that I think asserted the claim as a derivative claim. Correct? Well, I think Fairholme's the only one on appeal who styled their claim as derivative. There were other plaintiffs who have been amicus here, the Fisher-Reed plaintiffs, who brought a derivative claim. But my point is... But it has been. Why hasn't it been briefed? Why hasn't the opportunity to brief it been there? Because it was raised below, and it got about a page and a half here. I mean, it has been briefed, correct? I don't believe it was briefed before this court because it wasn't right, because the court said that we did have a derivative claim. But in any event, that's where we would, in response to your question, if you hold that there are no direct claims, and hold that the derivative claim is barred by the succession clause because First Hartford does not apply, then there would be no claim of any kind under the takings clause in this case. There would be nothing left unless... Let me ask you, before we get to the... This is Judge Krosz again. Sorry to interrupt, but time is short. If we... Without getting to the succession clause, just on the point of whether or not these are derivative or direct claims, if we concluded they were derivative claims, what would be the property interest that the shareholders are asserting that would rise to the level of a taking? Because everything they're asserting is on behalf of the corporation, right? No. Glad you asked that question. And the question, Your Honor, I think should be in the opposite order, which is, what is the property interest... Well, I get to ask the question. You don't. I'm sorry, but... No, I apologize. You asked if the claim is held to be derivative, what is the property interest? Yes. And then we would have to identify a property interest owned by the corporations, which would be the corporation's property interest in its network, in its assets. But that is not the property interest the shareholders have asserted in their takings claim. And we have brought a takings claim on behalf only of the property we own, the property right in our right to future dividends and distributions and liquidation. And that is property that the shareholders and the shareholders alone own. The corporations, the companies, do not own those property rights. Well, that seems to be completely inconsistent with your point that you'd like to argue that there should be exceptions to the ability to bring a third-party claim so that we would allow the derivative claim to go forward, despite the... That's why we didn't argue that, because we don't think it is a derivative claim. We think it is a direct claim, and we argued for a direct claim. Well, okay. All I'm saying is... Are you arguing on behalf of the Fairholme plaintiffs, too? No. Mr. Barnes is arguing on behalf of... Well, so there's nobody this morning that's arguing the takings issue with respect to the assertion in the Fairholme claims that there's a taking, even if their claims are derivative? There's nobody here arguing that? Mr. Barnes is arguing that issue. Well, why didn't you just tell us that he wasn't prepared to do that? That was Mr. Bennett. Oh, okay. Mr. Barnes has not argued yet. Got it. Mr. Hume, please proceed. Thank you, Your Honor. Your Honor, I would like to emphasize the threshold point of our direct standing claim, which is that we are suing for the taking of a property right that the shareholders and they alone owned. That is the right to receive dividends and other distributions under various circumstances. The companies cannot bring that claim, and it therefore cannot be a derivative claim, because the companies never owned that property right. They never owned the property right that we, the shareholders, focus on. And as a matter of simple federal law, if we come to court and identify a property right and allege that it has been taken, we have standing to bring that claim. But is there a difference, as the government points out, between Article III standing and the ability to assert claims that would otherwise belong to a third party? I mean, it's damage to the corporation that damages your receipt of dividends, correct? No. It is correct that Article III standing and prudential third party standing are two different threshold issues. But both are satisfied. Both are satisfied if we, the shareholders, identify a property interest that we and we alone owned, and we are suing for the taking of that property. There's a separate question... Didn't both Roberts and Perry reject that theory? No. Perry Capital squarely upheld it in the context of a breach of contract claim for the breach of the shareholder certificate contract. Which we don't have here. Correct. But they said that was a direct claim. Right. And that's very different. It's not very different. My point is it's not different at all. And the key thing here, Your Honor, is it's not a question of the merits of the taking of the claim. It's a question of who owns it. And we owned a property right to dividend. And specifically, Your Honors, if I might, prior to the network sweep, the shareholders, the private shareholders, owned a property right to receive a dividend whenever the U.S. Treasury received a dividend in excess of the 10% dividend on its senior preferred stock. That property right existed as a matter of black letter law based on the applicable shareholder agreement and the governing state law over the rights of shareholders. But the question is not who... When you're talking about direct versus derivative, the question is not really who owns the interest, but about whether the injury is independent of the corporation's injury. Your Honor, I don't believe that is correct. If there's one case I would really hope the court would read from Delaware law, it's the NAF case, the NAF Holdings case, which addresses the kind of confusion that can arise when federal claims are brought or when the shareholders bring claims and the Thule test is applied without fully understanding what the Thule test really is. That was a case, the NAF Holdings, that the Second Circuit certified to the Delaware Supreme Court. The fact of that case was a corporation created two subsidiaries. Those two subsidiaries, so the corporation was the shareholder. Its subsidiaries were going to acquire a big apparel company. And then the shareholders... Where do you brief this case? This case is cited in our briefs, but I think it was not fully unpacked, because what it says on pages 179 to 180 of the opinion is that the Thule and its progeny is not intended to determine every single time a shareholder has its own claim, whether that claim, because it also is intertwined with injury to the company, is direct or derivative. Okay, let's say it wasn't really unpacked. Does that mean it wasn't really briefed? I don't think the point I'm making now was made with respect to NAF Holdings. The point was made more generally that the Delaware case law on direct derivative focuses on the fiduciary duty claims brought by stockholders in context where it's very unclear whether the fiduciary duty is owed to the stockholders directly or only to the company. And therefore, it's confusing and has to be worked through in that case law whether the claim is direct or derivative. Well, I'm unclear. This is Judge Prost. I mean, I thought we were arguing that the complaint here, the charge here, is the transfer of net worth from the corporation to the treasury and that that's the gravamen of the takings claim. Now, you're saying you have a right to a... Let me finish the question, please. You're saying you have a right to receive a dividend payment and that's kind of your property right, but the dividend is predicated... ...on this net worth of the corporation, on the transfer of the net worth. That's the taking. Judge Prost, I think you put your finger on the heart of the issue. If the case is framed as being solely about the requirements that the companies pay their entire net worth to the treasury, it obviously looks like a claim that the companies would bring... It doesn't have to be solely about, but if that's the gravamen of the complaint and the claim, it doesn't... Solely is, I think, too harsh a word, too stringent a word. I wasn't suggesting solely, but that really is the gravamen of the complaint, I think, on the takings end. And therefore, your dividend argument is subsidiary to that because the dividends flow from all of this net worth transfer. Your Honor, we don't think it's subsidiary. We think the gravamen is that we had dividend rights that were completely nullified and transferred to the treasury. That's the heart of the case because those are our rights. The treasury has been paid out $125 billion in excess of what it received under the 10% dividend. If it weren't for the net worth sweep, that $125 would have had to have been shared with the private shareholders. Most of it would have gone to the government, but some of it would have gone to the private shareholders because any time... The structure of this shareholding by the treasury was that it got a 10% senior preferred dividend and warrants to acquire 80% of the common stock for next to nothing. So if it wanted a dividend above 10%, it could exercise its right to get the common, and then dividends could be paid on that, but that would require paying the coupon on the junior preferred owned by private shareholders, and 20% pro rata allocation to private common shareholders. That was the state of the property rights of all the shareholders in these companies prior to August 17, 2012. After August 17, 2012... I think I have my answer to the question, and I think I heard the bell. I did not hear the bell, although I have a stopwatch that shows you've had well more than your 10 minutes. Mr. Lippis, what does your clock show? Currently, we are well into Mr. Rosenberg's period of time. All right. Let's stop Mr. Rosenberg with his own five minutes. Absolutely, Your Honor. Good luck. Your Honor, it's Mr. Rosenberg. Let me just pick up where Mr. Hume left off on standing, and there are a couple of different arguments I'd like to address, but I fundamentally agree with him. We are talking about rights, dividend rights, and the liquidation rights. The liquidation rights don't flow from the net worth value of the corporation at all. And the dividend rights and liquidation rights are unique property interests that the shareholders have. The Cowen case from the D.C. Circuit that the government cited in its brief specifically says that dividend claims are unique claims that are direct, that are held by shareholders. And so under the Thule test, the question is, who's got the claim and who gets the remedy? We've got the claim, and the remedy, and this is critical, is not repaying the amount to the companies. We are not asking in this lawsuit for the companies to be repaid. We are asking for direct damages to us. But Mr. Rosenberg, isn't it true under Thule that there has to be an injury that does not depend on harm to the corporation? And here, all of this harm results from the harm to the corporation, right? It does not, Your Honor. The liquidation preference is entirely independent of harm to the corporation. And as I said, our dividend rights are independent of harm to the corporation. How could that be, counsel? Because all of those things wouldn't be impacted but for the fact that the corporate net worth has been swept, right? No, not at all, Your Honor, because the impact is because our rights were directly transferred to Treasury, which was the controlling shareholder at the time. It doesn't derive from the harm to the company as far as its net worth. It derives from the Third Amendment's transfer of the dividend and liquidation rights directly to Treasury. It's a different mechanism. It's totally different. So this depends on our concluding that Treasury was actually a controlling shareholder under Delaware law? Not necessarily. It simply says... I mean, that helps, but that isn't critical. But the point is Treasury was a shareholder. And so there was a... But it didn't have voting rights, right? It had the ability to obtain warrants for a nominal price, which is very analogous to the situation in Star, where on the stock split claim that was found direct at that point, the right was of a preferred holder to exercise warrants in that circumstance as well. It's almost directly analogous. And that was a case where the claim was direct. So it is a direct claim. The other point I want to make on this to follow up with Mr. Hume is the argument he was making about who owns the claim being the threshold issue, even beyond Thule, was made in our opening brief at pages 31 to 32, but we were relying primarily on the Citigroup case, which is subsequent to NAF and says basically the same thing. It says that where you have a claim that really is an independent claim that a shareholder possesses, you don't even get to Thule, you don't even get to dual nature, because it's inherently part of the claim that that individual party has. And that's the circumstance here. These are claims that we have uniquely. The company can't assert our liquidation preference. They can't assert our dividend claims. There's no way the company could assert that. And so these are not derivative claims for that reason. Another reason, Your Honors, is that this was a restructuring of equity. This is an argument we made in our briefs that the government never responded to. So you're saying 31 to 32, that's where you have NAF as a CILF site, which is the totality of the discussion, right? Right. You're saying that's the only place? I don't know if it's the only place. The most important place in the brief for our argument is there, and we're citing Citigroup for the exact same point. It's the exact same argument. And so that's where we're saying that's the point. Basically, you say it's one paragraph, right? Right, but that's a threshold argument that says that you don't even get to dual nature or to Thule if the claim is independently owned by a shareholder, right? And that's what we're arguing here. It supports the whole section of the brief that that's in, but that's the pages where we cited Citigroup. What do you do with the fact that the district court in Perry found that the question of liquidation rights were not ripe, and that that question wasn't even appealed? But that was a contract claim. That wasn't part of the property interest for a takings claim. I mean, the point is that whether that was ripe for a contract claim or not is completely different from whether that's a property interest that supports a takings claim. And with respect, they're very different inquiries. And so it is part of the property interest. That's what the takings claim looks at is who owns the property interest. I see my time is up. Could I just conclude by making one additional point, which is that the cases we cited on naked reallocation of equity, the Supreme Court's Allegheny decision, Citigroup supports this, GATT supports this, where there is a change in the equity rights, which here are the dividend rights and the liquidation preference, that ends the inquiry. It is a direct claim. It is not a derivative claim. So you've got Delaware law, you've got federal law that all say that without getting into the dual nature doctrine, which we think we win under anyway, but you don't even need to get there. These are quintessentially direct claims. I was supposed to address the contract and fiduciary duty claims, but let me just ask, does the court have any questions about the breach of implied contract or fiduciary duty claims at this point? Apparently not. Move on to Mr. Morocco for the last two minutes. Unless I heard you, Judge O'Malley. No, I was just going to say about the implied contract. Does the ability to assert that depend on us believing that First Hartford controls here? I don't think so, Your Honor. Those are direct claims. Those are claims, again, that we hold. That's not a corporate claim. The corporation could never assert that we were third-party beneficiaries of a contract. There's no reason they'd ever do that. That's a unique claim to us. And so it's a direct claim. And so First Hartford, with respect, is irrelevant to that question, we believe. Okay. Thank you, Mr. Rosenberg. Mr. Morocco. Thank you, Your Honor. Your Honor, Drew Morocco, on behalf of the Arrowwood plaintiffs, may approve the court. In Fairholme, the Court of Federal Claims correctly held that if any shareholders could bring direct claims, it would only be those shareholders, like the Arrowwood plaintiffs, who held stock as of the date of the net worth sweep. If this court agrees with the plaintiffs, as argued by Mr. Hume and Mr. Rosenberg, that direct claims may be brought, they may only be brought, the court should rule that they may only be brought by those shareholders who held stock as of the date of the net worth sweep. In order for a court to find a compensable taking has occurred, it must find that the claimant had a valid property interest at the time of the taking, i.e., the shareholder held Fannie and Freddie stock at the time of the net worth sweep. The court below correctly rejected arguments also made here by the Fairholme plaintiffs that plaintiffs that did not hold their interest in August 2012 can still bring claims pursuant to Bailey, a Court of Federal Claims decision that created a narrow exception to the basic rule in the limited context of a temporary regulatory taking of real property interests, where the nature of the taking, such as land use restrictions, is inherently subject to change over time. Isn't there also more than just the timing? What about the fact that as of the time that stock was bought, the conservatorship was already in place? Isn't there an impact on the scope of the right if you enter into an agreement or buy stock in such a highly regulated entity? I don't believe so, Your Honor. If I follow the question, the ownership interests have to be established and concrete at the time of the net worth sweep. Only plaintiffs who owned their interest at that time had such concrete interest. I don't think you understood because it was actually kind of a softball question, but all right, go ahead. This exception, however, does not apply to the case which is not a temporary regulatory taking or real property case. Further, this narrow exception has never been adopted by this court in any form. Also, inapplicable are cases like the Palo Zalo case that distinguish between a regulation that is promulgated and when a land use taking claim is right based, for example, on the denial of a permit application. Those distinctions are simply not present here. The net worth sweep was a direct taking that had its full effect when it was implemented and wiped out the interest of all shareholders other than Treasury. Arrowood asked this court to rule first that Fannie and Freddie shareholders may bring direct claims to address the direct injury caused by the net worth sweep, and second, that only those plaintiffs like Arrowood that held their interest at the time of the net worth sweep have standing to pursue their direct claims. Thank you. Thank you, Mr. Morocco, and we will hear from Mr. Barnes for eight minutes and hope that if Mr. Bennett is not aboard now, I would certainly hope he could be aboard for the governance, to hear the governance argument, and if any extra effort is to be made to bring him back, now's the time to do it. But I assume nothing's been heard from Mr. Bennett? Your Honor, I believe Mr. Bennett is on the call right now. I believe I'm seeing his number back on. We haven't had a moment to do a check. Mr. Bennett, are you with us? Yes, and I've been for quite a while. Okay, excellent. Thank you. Mr. Barnes, please proceed. Thank you, Your Honor. This is Brian Barnes with Cooper & Kirk on behalf of the Fairholme plaintiffs. Unlike anyone who's argued so far on the plaintiffs' side, I do represent plaintiffs who are bringing derivative claims, and so I'm mostly going to focus on the succession clause. Let me address a couple of issues that have already come up during the course of the argument. First, the property interest for purposes of the derivative takings claim that we're asserting is the company's interest in their earnings. It's their net worth. That's what was taken, at least for purposes of the derivative takings analysis. I think that it's a different property interest that's at stake when we're talking about direct takings claims, but the derivative takings claim, we're concerned with the company's net worth. Let me ask you about that particular question. If the claim is about the company's net worth, do you have a problem in that there was, and I understand there's debate over whether there was actual consent to the conservatorship, but with respect to your claims, you do not argue that there wasn't consent to the conservatorship. You simply argue that it's the Third Amendment that affects the net worth. Don't you have a problem in that having consented to the conservatorship with the broad powers and authorities that Collins just described that it has, that there's a reasonable expectation that the net worth would not be taken? Well, a couple of points there, Your Honor. One, my client, the client who's asserting the derivative claim, Mr. Barrett, did own his shares before the conservatorships began. But the other point is, in Collins itself, I think the court's quite clear in recognizing that these powers that FHSA has, they extend to basically allowing the FHSA to manage these companies in a way that essentially promotes the public interest and enriches the public's risk at the expense of the companies themselves. And so, I think far from foreclosing and taking the claim... Yeah, but you're talking about the interest of the entities, and you have the board members having consented to the conservatorship, correct? Well, respectfully, Your Honor, I don't think anyone who looked at the history of federal conservatorships and receiverships under this statutory regime would have anticipated anything like the net worth sweep. I mean, there have been literally thousands of conservatorships and receiverships overseen by the FDIC, and there's never in the history of conservatorships and receiverships been anything like this. And so, I don't see anything in Collins that changes the fact that this is not something that the boards could have reasonably anticipated when they consented to conservatorship. And what's more, I would submit that if it were the case that, per se, the imposition of conservatorship authorized the government to take all of the net worth of these companies full stop, that that would mean, necessarily, that the imposition of conservatorship itself affects the taking. And I think this Court has been careful to avoid that conclusion, but the only way you can avoid it is by recognizing that it's not within the realm of what investors reasonably anticipate when a company is put into conservatorship, that the government's just going to take all the money. Let me also address, if I could, the issue preclusion question. So, I think the easiest way to deal with that issue is to just recognize that the issue here with respect to our constitutional claims is just different than the one that was before the Court in Perry Capital. And the best authority for that is the District Court's opinion in the Roth case, the Western District of Michigan case, where the judge in that case actually said he disagreed with this Court's decision in First Hartford. He thought Perry Capital was right on the harsh portion of the D.C. Circuit's opinion that the government says is preclusive. And he, nevertheless, allowed constitutional claims to go forward because he didn't think that the Succession Clause speaks with enough clarity to foreclose constitutional claims even if it does foreclose statutory or common law claims. With respect to the merits of the Succession Clause issue... ...did the judge foreclose constitutional claims in the form of direct claims or didn't foreclose constitutional claims in the form of derivative claims? You know, I'd have to go back and look at the Roth decision. I'm not sure that the judge in that case actually resolved this issue. If memory serves, I think he may have actually decided that the claim was derivative. And that's how he got to the issue of whether First Hartford was correct. And he said, no, First Hartford's wrong. But nevertheless, I'm going to allow these constitutional claims to go forward. And my point here in citing to that decision is we have a federal judge who's not only recognizing that these are distinct issues, but it is resolving them different ways. And so, at least when we're talking about issue preclusion, I don't think there's any serious doubt that these are different issues. And we see that in Collins too, right? Because in Collins, the Supreme Court allows the constitutional claim to go forward notwithstanding the Succession Clause, but nevertheless, reserves the question of whether the shareholder's statutory claim would have been foreclosed by the Succession Clause. Do you agree that, despite what your colleague said, that this issue was briefed below by the Fairholme plaintiffs and was briefed at least, albeit briefly, in your supplemental brief before us? And I apologize, Your Honor, when you refer to this issue, have you talked about issue preclusion? Meaning that whether the derivative claims could still go forward despite the Succession Clause? Oh, yes. I mean, I think that's half of our supplemental brief. Except that they're constitutional. Yeah. So, half of our supplemental brief is devoted to that issue. And then we hit it again in the reply brief. You know, one critical case, as we talk about these constitutional claims, is Webster v. Doe. You know, that's a Supreme Court opinion that recognizes a very strong, very, very strong candidate of construction. I think it's one of the strongest in all of statutory interpretation. The courts should strain to avoid interpreting federal statutes in a way that makes it impossible for litigants to bring colorful constitutional claims. And what's more, I would submit to the court that it would be a taking and it would be a constitutional problem if the court were to interpret the Succession Clause in a way that foreclosed derivative claims in situations where the conservator is conflicted, that that itself would affect the taking. And for that reason as well... Well, let's assume... For purposes of this discussion, Mr. Barnes, and this is Judge Crouse, let's assume, hypothetically, that we don't agree with the Court of Federal Claims and First Hartford. So let's assume there's no conflict of interest problem with the Succession Clause. Isn't the language of the Succession Clause quite clear and quite strict and could have created exceptions and didn't? And isn't that the way it's been interpreted? Respectfully, Your Honor, I don't think that's the way it's been interpreted. It's not how First Hartford interpreted it. It's not how the Delta Savings Bank case from the Ninth Circuit came out. And with respect to the statutory text, our fundamental submission is that this is a Succession Clause. It's not a Termination Clause. And there's a separate provision of this statute, 4617B2K, that specifically talks about under what circumstances during receivership, not conservatorship, but receivership, certain shareholder claims are terminated. And the fact that the Succession Clause speaks in terms of the government succeeding to our claims as opposed to those claims being terminated, I think that's the critical sort of textual linchpin for this analysis. But again, there's a critical constitutional avoidance concern here, too, because under the government's construction of the Succession Clause, there would be a serious due process problem. Thank you, Mr. Bonds. Mr. Stern for the government has 40 minutes, and you've asked to reserve a good number, up to 15, for rebuttal on the cross-appeal. And of course, you're well aware that that depends on the extent to which Mr. Bennett or anyone else uses any of his further time on cross-appeal issues. But I know you know that, and please proceed. Thank you very much, Your Honor. I'm Mark Stern for the United States. And there have been a number of issues that have been raised. I'm happy to begin anywhere the Court would like me to. If there are no particular places that the Court would direct me to, I would start with the issue of the derivative claims, which some of my friends on the opposing side have addressed. Well, Mr. Stern, this is Judge Prost. I think we may be going in the same direction, but I have kind of a threshold question. It seems to me we have two global questions. The first is whether or not it's a claim against the United States, and I'm not asking you to start dealing with that. But then we've got the question about whether plaintiffs have standing to bring either direct or derivative claims. And the standing question... So my question is, if we were to decide the standing question in your favor, does that obviate the need for us to deal with the issue of claims against the United States? Yes, I think that if the Court concludes that these are derivative claims, that they're barred by the succession clause, then there is no reason, I believe, I could go back and check, but I believe that would obviate, as you say, any need to deal with whether, in this circumstance, the conservator was acting in a governmental capacity. Okay. Well, why don't you proceed then in discussing the direct derivative step, which is, I think, where you were going in any event. Thank you. Yes, thank you, Your Honor. I think that these are classic derivative claims, and the Fairholme plaintiffs recognize them as much. And the characterization of the claims as being claims for dividends, I think, really misses the point of the distinction between direct and derivative suits. The point about a derivative suit, as the Court emphasized, citing its earlier cases in Starr, is you look to who was harmed and to whom would any recovery flow. And it's clear in this case, both from the complaints and it just is true, that the asserted harm is the asserted harm to the enterprises, and any recovery would go to the enterprises. And if that, either in a short-term or long-term, either increased the value of plaintiff's shares or gave them dividends, which they had not been receiving prior to the Third Amendment, then that would all flow through the enterprises and the conservator in the end for the enterprises. There's nothing direct about any part of this. Can we go to where we sort of ended up with Mr. Barnes, and that is, assuming that we agree with you that they're derivative claims, how would, under your theory, the corporations or the shareholders on behalf of the corporations ever be able to pursue a constitutional claim on behalf of the corporations under your reading of the Succession Clause? Well, I think that it's really parallel to the situation in Starr, which also involved constitutional claims of this kind, and the conservator, even though plaintiffs always suggest that this would not happen, but the conservator has the right to assert all kinds of claims. The question here really isn't which kind of claim we're talking about. It's whose claim it is. But Starr specifically pointed out that no argument was being presented under Kowalski. I mean, obviously, Starr recognized that there was at least an issue that related to the constitutional avoidance question, and they said that Starr simply was not asserting any claim like that. Starr was insisting that they were all direct, period. Yes, but they were asserting that, but the court said that they were derivative claims, and there was no... And again, what Starr was asserting was, just as in this case, they were asserting takings and illegal abjection claims. But how do we get around the fact that Starr explicitly said that it had to go through a threshold list of the things that weren't being asserted before it got to where it ended up? And one of them was the Kowalski land cases. Your Honor, I admit I'm sorry, but I can't remember that precise language. But again, what we have here is there's no reason to, and I'm not aware of any authority, that suggests that because a plaintiff is filing a claim as constitutional, that that alters the direct derivative analysis. Correct. What I'm saying is, even if we accept that fact, isn't there the issue as to whether or not they should be allowed to assert the derivative claim if it is of a constitutional nature? We don't think, obviously, that there is any basis for asserting that. Where the Supreme Court has said that there are values, that a court should be reluctant to look at a statutory bar to preclude constitutional claims. First of all, it didn't say that you couldn't have a bar. But also, what we know is that in this case, the succession clause was enacted with the precise point of looking at what fits the whole point of the succession clauses, that Congress knew that there was going to be an extraordinary infusion of capital from the Treasury to save these enterprises, which were on the brink of falling down and taking much of the housing market with them. So what you're saying is that a takings claim, it would look like FHFA versus FHFA, correct? No, a takings claim would look like FHFA versus the United States. Because the rights were transferred to the conservator, and the conservator could assert those rights. It might not choose to do so, but it could. And again, the... But the rights would have to be... OK, go ahead. I mean, it's the... I mean, again, it flows from the fact that the harm is to the enterprises, and therefore those rights have been transferred by statute to the conservator, who can assert them. Right, but the government actor who allegedly did the taking is the FHFA, right? So when you said it would be against the United States, in this case, the United States is the FHFA. Well, obviously, we disagree with that, but the question, again, is... To read the succession clause to permit use of this kind would suggest that Congress sort of was, like, enacting a provision that sort of you could, you know, sort of drive a bulldozer through, because it was entirely concerned with suits by the shareholders against, like, asserting the rights of the corporation. You couldn't have a clearer expression of the... Let me ask you about that. Leaving aside the succession clause, if we're just looking at the derivative claim, what's the property interest there that's being protected under the Constitution? Your Honour, it's not clear, and we have not briefed that, because to some extent that sort of loops into a merit question, but the property interest, we think, is, again, we're looking at what is the property at this point of the conservator, I mean, of the enterprises, and then sort of being managed by the conservator, and that is, I mean, it's all of a piece, we think. And this is, you know, look, the Court of Federal Claims recognized this is a classic derivative suit. The Court of Federal Claims said that its hands were tied, I think that was the phrase that it used, by this Court's decision in First Hartford, and that was the only reason that the Court of Federal Claims said that these could go forward. It was absolutely clear, and I think the Court was 100% right to recognize that these are derivative claims. And everything I think that, like my friends on the other side have been saying, this is sort of tends to confirm that. Counsel, can I back you up a little bit? You said that the Supreme Court has never said that Congress can't legislate away a constitutional claim, but it has said that to the extent it would, that Congress would ever be permitted to do so, it would have to do so expressly. And you're not arguing that there's an express statement in ACRA that says that this would, that the sweep would encompass constitutional claims, you're just saying it's implied, right? No, I think that what we're saying is that the, again, that all claims were transferred to the shareholder, excuse me, to the conservator, and that it's not that there's a sort of difference of some patronomy of some claims were transferred and others weren't, they were all transferred to the conservator, so it's not that- So you think that constitutes clear and convincing evidence within the meaning of Califano? Absolutely. I mean, this really couldn't be clearer, and the idea that what Congress said was, I want you, all that we're talking about is, do you have a right to a derivative claim? And that's not the sort of concern that the Supreme Court has ever been concerned about when it's dealt with the very grave questions, you know, that have been raised in some of the other cases. This is an elimination of a derivative claim, and this does not rise to constitutional dimension. Would the court like me to address First Hartford, which was the basis of the Court of Federal Claims conclusion, that these weren't derivative suits? Because to some extent, I think that these sort of, in some ways, this sort of mirrors or is an extension of the point I was just trying to make, which is that trying to imply an exception to this statute requires one to disregard the entire background against which it was enacted. But how are we as a panel to ignore First Hartford when the language of the provisions that First Hartford were looking at was identical to the language here? Well, I don't think that the... I mean, the question here is that you have a... Whereas in First Hartford, the court was dealing with the situation of a... of the FDIC as receiver, and that sort of comes up, you know, that's a problem that comes up in all sorts of, you know, totally unpredictable ways. And the court said that... And it went out of its way to explain how narrow its holding was in that case, where you had the, like, FDIC as court... like, FDIC corporate issuing a sort of regulation in sort of the general Winstar vein, and then, like, the very same sort of claim is what would have to be asserted by the receiver. But that's something that... There's no way Congress could have ever predicted that kind of a claim. And when you don't hear, on the contrary, Congress knew exactly what it was dealing with. Mr. Stern, this is Judge Prowse. Just to follow up on what Judge O'Malley was asking, am I correct that other than our Court of Claims judge here, who said that it controlled, everybody other courts that have looked at this have reached the opposite conclusion? I.e., Diane Wood in the Seventh Circuit and Perry? Or am I mixing this up with something else? Yes, you are correct, Your Honor, and that's why we have the issue, preclusion ruling in this suit, because the court in Perry Capital concluded that there was no conflict of interest exception. So, yes, we... The other courts that have looked at this have concluded that there is no conflict of interest exception. Mr. Stern, the other courts are not binding on us, whereas First Hartford is our court's decision. That's 100% true, Your Honor, and we are not suggesting that, as the panel points out, that, of course, as a panel, can't overrule a prior decision of this court, and we have not urged it to do so. We've said that this situation is very much distinguishable from First Hartford on a variety of grounds, and also we've emphasized how careful the court in First Hartford was to explain that this was... that it was addressing a very precise situation, and here the nature of what is happening and the background against which this has occurred, we think, really sort of precludes any inference that the court should imply an exception, at least in this circumstance. Maybe there's another circumstance involving, you know, involving FHFA's conservator, where there might be a different result, though I don't know what it would be, but one doesn't need a blanket rule. It's enough to say that in this case, First Hartford does not control and didn't purport to set out a broad rule that would encompass this kind of a situation. But, counsel, even if we agree that First Hartford did not set out a broad conflict of interest rule, because that could, as you say, swallow the whole point of the succession clause, but even if we agree that it didn't do that, wouldn't the fact of the conflict of interest possibly constitute a hindrance within the meaning of Kowalski with respect to the assertion of the claim? No, Your Honor. I mean, this, again, if we're coming back to what Congress intended to do, Congress clearly did not perceive that there was going to be a conflict of interest that would render the succession clause essentially, in a broad variety of cases, would essentially undermine the whole point of the succession clause. Right. What I'm trying to do is limit you to just the constitutional issue. Assuming we agree with you as it relates to the other causes of action, like any derivative contract claim or any derivative fiduciary duty claim, wouldn't there still be this question of whether the conflict of interest could constitute a hindrance for purposes of the constitutional analysis? Well, we don't... I mean, I think that the answer is no. We think that Congress clearly anticipated that there could be claims of this kind, and so this wouldn't be, sort of, to say that Congress left open the door to any derivative suit claim when it transferred all rights. I don't think that that's a plausible reading of the statute. And again, the... Although, what we're talking about here is simply, like, has Congress foreclosed a derivative suit? And that's not, sort of, something that rises to a constitutional dimension in any case. But again, if this succession clause means anything, it means that having transferred the shareholder rights, that the shareholders don't then get to bring derivative suits, and whether they are... And that's the case even if the claim is that there is taking away the right to bring a derivative suit impinges on some constitutional concern, because we think that there's no basis, you know, for that, and there's no precedent for that. Do you agree with what the amicus brief said, that there has never been a case that found clear and convincing evidence that Congress intended to foreclose jurisdiction over a constitutional claim? I don't... I don't want to say, like, that there... To sort of argue, like, with a negative... Well, you haven't cited us to any such case, right? No, I have not cited you to any of that. But you want us to make that... You want us to reach that conclusion here? I want to... Sure. And I would like to have the Court reach the conclusion that the fact that there is a takings claim being asserted on the ground, that not because Congress had said you can't bring a claim, but because it transferred the rights to bring that claim, so that there is a derivative suit bar on claims. Like, we, you know, we are saying, like, that... However that's characterized, and characterizes that as some sort of deprivation of a constitutional claim, then in this case that is exactly what Congress did. There is no reading of the succession clause that would permit another outcome. And the general thrust, you know, of the plaintiff's arguments has not been to make this kind of a claim. It's to argue all sorts of things about how there is a right to dividends that's separate from what the harm to the corporation. And none of these arguments, you know, has any substance to it in the end. No, I was asking whether you have anything further to say for now. Well, I have questions. I mean, I'm happy to address the governmental character of... I'll just do that briefly, and obviously any questions that the Court has about that. But again, I think that the French recognized explicitly that the conservator does not always act as the government, and that, indeed, as you pointed out, the contrary ruling would suggest that there are several cases that we cited in our briefs involving various constitutional claims, such as Bivens' claim and Chikasa's claims, or claims as to what statute of limitations applies or the conservative status under the False Claims Act, that there would have been a substantial reading of all of those cases. And the argument is, well, this is a bigger thing than that. But as all the other courts to look at this, like with Peri Capital, for example, said, look, this is a quintessential act of a conservator. It's renegotiating a contract, and that's in the heart of what conservators do. But didn't Collins explicitly say that entering into the Third Amendment, the very thing at issue here, was an exercise of executive power? I think you could say yes or no on that one. I think I'd say no. I'd like to nuance it a bit. What the court is looking at, the court cited a bunch of factors that, for purposes of a separation of powers analysis, led it to conclude, and this was consistent with what the government was arguing, in that case more broadly, that you could have, that there would be a government, that for separation of powers problems, in terms of the status of the director of the FHSA, that yes, that was a governmental, I'm sorry, I see that I'm out running out of my time, that it held it for that purpose. But it clearly does, and the court described a number of powers, but here in renegotiating the Third Amendment, there is no claim that there was any exercise of a governmental power by the conservator. That's why the courts, the other courts to look at it, have said that this is a classic exercise of the kinds of powers that belong to private boards and conservators. But Mr. Stern, this is Judge Prok, didn't the Supreme Court in Collins explicitly say, that just differentiate this from the normal conservatorship, in several places? It says that FHSA powers under the statute, differ critically from those of most conservators. It can do the best interest of the company, to its own best interest and those of the public. Those are the words of the Supreme Court, right? That's right, but to be clear, that certainly isn't the only concern. The purpose of the enterprises, and the enterprises, charters, governing statutes, specifically emphasize, and the court decisions, we've cited in our briefs, emphasize this as well, that the enterprises themselves, always had a very important public purpose. They were not sort of simply, boards were never supposed to simply take into account, the interests of the shareholders. They had a broad interest in making affordable, low income and middle income housing available. And to a large extent, what we have here, is a sort of charge that is very similar, to the charge given to the enterprises themselves. And in addition, even though there's been the suggestion, that this is distinguishable from the FBIC, the FBIC's clause similarly permits it, to take into, in its acting as receiver or conservator, to take into account general public interest, and the interest of the corporation specifically. So there's a direct parallel there too, and there are other sort of entities, that also take the public interest into account. And there's nothing unusual, with about differentiating them, that's the case, like in the Thacker versus TVA case, where Justice Kagan said, look, for some purposes, it's gonna be governmental, others it's not. And in that case, the issue was, whether there was sovereign immunity, which would be the case if it was governmental, and wouldn't be otherwise. Okay, thank you. Thank you, Mr. Stern. We will save the remainder of your time, if there is something to properly respond to. Mr. Bennett, welcome back. I see you have five minutes of rebuttal time. This is Mr. Rosenberg, can you hear me? Yes. I believe Mr. Bennett was gonna cede, the beginning of the rebuttal to me. We're partners, and so we've communicated about this. All right, you have five minutes. All right, just a couple of quick points on standing. I think number one, it is critical to realize, that the Delaware Supreme Court, has held that before you get to Thule, before you get to the question, about whether there is a harm to the corporation. And I quote here from NAF, and is a virtually identical quote from Citigroup as well. A more important initial question, that has to be answered, is does the plaintiff seek to bring a claim, belonging to her personally, or one belonging to the corporation itself? Here the shareholders seek to bring a takings claim, that can only belong to them. The transfer of their equity rights to treasury, those are not rights that the companies have, and those are not claims that the companies could bring. Isn't Citigroup though distinguishable? I mean Citigroup is a case about fraud, committed by the directors, in connection with the purchase of the shares. I don't see how that translates, to these circumstances. It translates because the claim here is, that the government, unconstitutionally took our property, without just compensation. It is not a typical equity dilution claim. It's not a claim that, the government brought in new money, and we're complaining about, what the government got for the new money. This is totally different, there was no new money. This was a simple reallocation. How is a right to a dividend, different from the injury to the corporation, that would give rise to those dividends? The dividends were going to be paid anyway, they were already in the pipeline. So the question was, whether those dividends went to us, or went to treasury, and they went to treasury. And we're not talking about, the actual issuance of the dividend, your honor. We're talking about the rights to dividends, and the right to our liquidation preference. Those are rights only we have. The corporation has no right to dividends. The corporation has no right, to a liquidation preference. Those are uniquely our rights. And I would say this your honor, we think that under Starr, this court's decision, this is clear enough, and that should end the matter, and under Allegheny, the Supreme Court, that this equity reallocation doctrine, makes it clear that these are direct. But if the court believes, that under Delaware law, these are really derivative, we would suggest you certify the claim, to the Delaware Supreme Court. We are confident that, Delaware Supreme Court would say, that these are direct claims, under Citigroup, under NAS, under Thule, because these are direct claims, that uniquely belong to the shareholders. Secondly, I would say again in Starr, footnote 15, the stop split claims there, were held to be direct. And the circumstance here, is a direct analogy. In that case, the government had, was a shareholder, at the time, or after the reverse stock split. That claim was brought, saying that, that was unlawful, or that was a taking. And here, Treasury was a shareholder, at the time, of the third amendment. And again, here, no new money was brought to the table. None. It's a very, very different circumstance, from the circumstances, in Delaware cases, that say claims are derivative. So you're saying, there's an injury, are you saying there's an injury, to the shareholder's right, to dividends, because, they didn't get paid? Because they lost the right, to ever get dividends. It's a threshold right. It's not whether they got paid, or not. It's whether they ever had a right, to dividends at all. Their right to dividends, was extinguished, and given directly to Treasury. All dividends, went from the shareholders, to Treasury. The liquidation preference, was the same. Our liquidation preference, was extinguished, and Treasury got, all of the rights, to a liquidation preference. So it was a direct transfer, of our rights, from the shareholders, to Treasury. Independent, apart from, completely different from, any harm, to the corporation. I see my time, is running out. One other point, I would just make very quickly, is that in Collins, the Supreme Court, specifically said, there, that because, the relevant action, in this case, is the third amendment, and because the shareholders, concrete injury, flows directly, from that amendment, the traceability requirement, is satisfied. That was on, the constitutional claim, there, and the court said, that that claim, was a direct claim. Our claim, is an analogous, constitutional claim, and that language, should apply here. I see the rest, of my time. Thank you, Mr. Rosenberg. I'm not sure, that, Mr. Stern, has, the right, to, respond, for it. I'm sorry, Your Honor, Your Honor, I'm sorry, Mr. Rosenberg, I meant, to cede the rest, of the time, to Mr. Barnes. Mr. Barnes. All right, well, there is no time, but I'll, give Mr. Barnes, two minutes. Thank you, very much, Your Honor. I just have, a couple of quick points, on the derivative claims. First, with respect, to, the suggestion, that FHFA, could bring these claims, I don't think that, FHFA would have, potential standing, to, assert these claims. We know from Collins, that FHFA, is the United States, and, the United States, can't sue itself. The second point, there was a suggestion, that, if we recognize, and follow, First Harper's, conflict of interest exception, that the exception would, somehow swallow, the rule, that the succession clause, lays out, but that's not right at all, because normally, in these shareholder, derivative actions, where a, financial institution, has been put into conservatorship, the shareholders are suing, prior management. A, good illustration of that, is the Pareto case, the case out of the Ninth Circuit, we, cited in the briefs, and in that case, the Ninth Circuit, even though it recognizes, a conflict of interest exception, and follows, First Harper's, it, rejected, shareholder derivative claims, because they were claims, not brought against, the conservator, but against former management. And then finally, in terms of whether, or not, First Hartford, can be distinguished, from this case, I think it's instructed, to look at the Solicitor General's, briefing and columns, in the Supreme Court, there was a lot of backing, and forcing, in the Supreme Court, about whether or not, First Hartford was right, but what the Solicitor General's, office did not argue, is that First Hartford, was distinguishable, from this situation. They just took a run, at arguing that First Hartford, was incorrect, and that the Supreme Court, shouldn't follow it. The Supreme Court, obviously, didn't reach that issue, and this panel, is bound by First Hartford, and for all those reasons, we think the derivative, claims to survive. Thank you, Mr. Barnes. Unless I'm corrected, I do not believe, there's anything, from Mr. Stern, to respond to, concerning the cross appeal. That being, the, I mean, I'm happy to, like, if I don't have any, right to the time,     were those, that we've brought, on our cross appeal, to the Supreme Court, and I'm happy, to respond, to that. Thank you. Thank you. I'm still dealing, with the, with the derivative, nature, and the governmental issue, but I,  the court's discretion, whether I have, any rebuttal, or not. Do my colleagues, wish to hear, further argument, on,     on the submission. We thank all, counsel, for informing us, of that. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. End of argument. Case admitted.